17 May 06

From: Thomas LaBelle, Equal Employment Opportunity Specialist
To: Deputy Equal Employment Opportunity Officer, Human Resources Office Groton

Subj: EEO COUNSELOR REPORT ICO EEO COMPLAINT OF ROSEZOLA SELLERS

1. COMPLAINANT

a. Name: Rosezola Sellers (Rose)
b. Job Title: Computer Assistance Operator (CAO) GS-1144-05
c. Phone Number: (work) (401) 841-2111 DSN 948-2111
(home) [redacted]
d. Home Address: [redacted]
e. Organization: Newport Commissary Store
1163 Whipple St.
Newport, RI 02841-1639

2. COUNSELOR

Thomas LaBelle, EEO Specialist
Human Resource Office Groton Code OOE
Naval Submarine Base New London
Bldg. 83, Groton, CT 06349-5020
(860) 694-3307, DSN 694-3307

3. COMPLAINANT'S REPRESENTATIVE

Ms. Seller's chose not to use an attorney for the informal process and has indicated, in writing, that the following individual will be the attorney representing her in the formal complaint:

Patricia Andrews
170 Westminster Street, Suite 601
Providence, RI 02903
(401) 421-0966

4. BASES OF COMPLAINT

a. Race (Black)
b. Reprisal (prior EEO Activity)*

*Ms. Seller's claimed reprisal as a basis during the informal process but did not indicate reprisal on her Defense Commissary Agency (DeCA) Discrimination Complaint form.

5. ISSUES

a. Termination from employment on 1 December 2005.

6. RESOLUTION REQUESTED BY THE COMPLAINANT

a. Reinstatement with back pay.
b. Punishment for Mr. John Blythe, Store Director, Mr. Steven Furtado, Store Administrator, Ms. Mary Gibson, Grocery Manager, and Mr. William McCollum, Computer Assistance Operator.

7. DATES

a. Alleged Discriminatory Incident Occurred: 1 December 2005
b. Initial Counselor Contact: 2 December 2005
c. Rights and Responsibilities: 10 January 2006
d. Interviews Conducted: 2 February 2006
e. Notice of Final Interview: 23 March 2006
f. Formal Complaint Filed with DeCA: 7 April 2006
g. Formal Complaint Received by HRO Groton: 18 April 2006
h. Clarification of Formal Discrimination Complaint Letter sent to Ms. Sellers: 25 April 2006
i. Clarification received from Ms. Sellers: 4 May 2006

8. COMPLAINANT HAS GIVEN PERMISSION TO USE NAME DURING INQUIRY.

Yes

9. COMPLAINANT HAS BEEN INFORMED OF ALL RIGHTS AND RESPONSIBILITIES/PROCESS AND TIME CONSTRAINTS.

Yes

10. PERSONS KNOWLEDGEABLE OF COMPLAINT ISSUES.

a. John Blythe, Commissary Store Director, Commissary Store Newport, 1163 Whipple St., Newport, RI 02841-1639, (401) 841-1580, DSN 948-1580.
b. Steven Furtado, Store Administrator, Commissary Store Newport, 1163 Whipple St., Newport, RI 02841-1639, (401) 841-2111, DSN 948-2111.
c. Mary Gibson, Grocery Manager, Commissary Store

Newport, 1163 Whipple St., Newport, RI 02841-1639, (401) 841-2111, DSN 948-2111.

d. William McCollum, Computer Assistance Operator, Commissary Store Newport, 1163 Whipple St., Newport, RI 02841-1639, (401) 841-2111, DSN 948-2111.

e. Brenda Venable, Secretary, Commissary Store Newport, 1163 Whipple St., Newport, RI 02841-1639, (401) 841-2111, DSN 948-2111.

f. Stephanie Lopez, Supply Technician, Commissary Store Newport, 1163 Whipple St., Newport, RI 02841-1639, (401) 841-2111, DSN 948-2111.

g. Iva Felton, Store Operator, Commissary Store Newport, 1163 Whipple St., Newport, RI 02841-1639, (401) 841-2111, DSN 948-2111.

11. DOCUMENTS REVIEWED

a. Memorandum for Record, Reference Incident in Dairy Department by Brenda Venable, 29 August 2005

b. Medical Documentation provided by Rose Sellers to Mary Gibson regarding limited duty, 8 September 2005

c. Medical Documentation provided by Rose Sellers to Mary Gibson, 22 September 2005

d. Request for Additional Medical Documentation by Steven Furtado, 26 September 2005

e. Additional Medical Documentation provided to Steven Furtado by Rose Sellers, 3 October 2005

f. Memorandum for Record by Rose Sellers regarding confrontation with Mary Gibson, Grocery Manager, 12 October 2005

g. Notice of Proposed Removal by Steven Furtado, 17 October 2005

h. Letter of Caution by Steven Furtado, 28 October 2005

i. Response to Proposed Removal by Patricia Andrews, Esq, 18 November 2005

j. Notice of Removal by John Blythe, 1 December 2005

12. WORKFORCE PROFILE OF ORGANIZATION ENTITY

a. Management would not provide the Specialist with a workforce profile for the Newport Commissary for the protected group by race.

13. COMPLAINANT'S DESCRIPTION OF EVENTS

Rose Sellers (hereinafter CP) claims that during her employment at the Newport Commissary, John Blythe, Store Director, had Steven Furtado, Store Administrator, Mary Gibson, Grocery Manager, and William McCollum, Computer Assistance Operator, write false statements against her concerning alleged

incidents which resulted in disciplinary action and her subsequent termination. This includes being written up for "coughing on another employee" and "making faces while looking at the same employee's mother while she was in the Commissary." The CP denies doing these things and claims that other employees have had zero punishment for harsher behaviors to include one employee receiving no disciplinary action after referring to a co-worker as a "nigger"; and another employee was no disciplined after referring to one co-worker as a "flip" and another as a "honky" (the CP could not remember exactly who said it or exactly when it was said guessing at one to two years ago and no interviewee could recall ever hearing those words said).

The CP alleges that "for years" lasting until September 2005, Mr. Blythe and Ms. Gibson allowed other store employees (Brenda Venable, Michael Texeria, Brian Berbue, William McCollum) to stock for vendors during duty hours while they were supposed to be working for the Commissary. The CP believes that based on Mr. Blythe's behaviors towards her she never would have been allowed to stock for vendors during normal duty hours, although she admits she never asked. The CP contends that stocking for vendors became public during an Inspector General (IG) inspection last year and she believes Mr. Blythe blames the occurrence of the IG inspection on her. Mr. Blythe would not release a copy of the inspection report stating we would have to make the request through DeCA Headquarters. The requests to Headquarters, made on 13 February and 17 March 2006, also failed to produce the report.

14. <u>WITNESSES' DESCRIPTIONS OF EVENTS</u>

<u>John Blythe, General Manager, Newport Commissary, interviewed on 2 February 2006.</u>

According to Mr. Blythe (White), no one has had such a disruptive impact on the store as much as the CP and that if others had acted in the same way they would have been terminated as well. Mr. Blythe contends Brenda Venable swore at him one time so he verbally counseled her and the behavior stopped and was not repeated.

He claims they tried many different ways and times to work with the CP to include making her a Computer Assistance Operator (CAO) but that even with extensive training she was still not able to do her job and her shelves often had items missing. Mr. Blythe said the store was divided between the CP and William McCollum who were both responsible for ensuring proper levels of

merchandise were available on the shelves at all times and it would get to the point that he would rotate the two employees just so the CP's area could get stocked efficiently by Mr. McCollum. Mr. Blythe provided no documentation to support this however he did show pictures of low-stocked shelves that he claimed were the CP's area of work.

Mr. Blythe stated the CP would continue to disregard instructions, was disruptive on the floor and was disrespectful to himself, Steve Furtado and Mary Gibson. When asked for specific examples Mr. Blythe stated they were included in the CP's proposed termination letter:

a. Failure to Follow Instruction:

Spec 1 - On or about 30 June 2005, the CP failed to obey an instruction to complete a release for period 16 no later than the end of the day.

Spec 2 - On or about 2 September 2005, the CP failed to obey an instruction to write a witness statement for an official investigation.

Spec 3 - On or about 25 September 2005, the CP failed to obey an instruction to bring in medical documentation to support an absence from work for one week.

Spec 4 - On or about 11 October 2005, the CP failed to obey an instruction to stock new items in the U-Boat display.

b. Disruptive Behavior: On or about 29 August 2005, the CP allegedly blocked the passage of a co-worker in the Dairy Receiving area and then interfered with that employees movement when the CP pushed her pallet in the path of the co-worker which then caused a shopping cart to strike the employee.

c. Disrespectful Conduct:

Spec 1 - On or about 1 June 2005, the CP talked to and acted toward her supervisor in a disrespectful manner by contemptuously folding her arms and staring at her without responding to direct questions, and then loudly and contemptuously saying, "why don't you just follow me with a camera and take pictures" or words to that effect when questioned why a particular task was not performed that is the CP's duty to know how to perform.

Spec 2 - On or about 11 October 2005, the CP talked to her

supervisor in a disrespectful manner when she stated in a contemptuous manner "Oh right, Mary [Gibson] is just little Ms. Innocent; you're so innocent" or words to that effect.

Spec 3 - On or about 11 October 2005, the CP spoke to Steven Furtado, Store Administrator and second-level supervisor of the CP, in a loud, disrespectful and contemptuous manner "what do I look like, a two year-old child?" and "go ahead, write me up, I would like it written up also" or words to that effect.

Spec 4 - On or about 8 September 2005, and on or about 13 October 2005, the CP acted in a disrespectful manner toward a co-worker by coughing on him and saying "you're gay" and "you're so gay" or words to that effect.

Brenda Venable, Secretary, Newport Commissary, interviewed on 2 February 2006.

According to Ms. Venable (White), she has observed what she perceives as cliques within the Commissary but race isn't always the factor. She went on to explain that while she was attempting to get a union in the Commissary, Mr. Blythe would not speak much to her so she and the CP were friends. However, when she and Mr. Blythe started speaking again, the CP would no longer talk to her. Ms. Venable characterizes the CP as someone who would worry more about what others are doing versus what she does. She stated in her opinion, the CP purposely antagonizes co-workers by doing things such as staring at, coughing on, or giggling at everyone she doesn't like.

As the Secretary to the General Manager, Ms. Venable said she is involved in paperwork and that the CP always refused to sign anything, to include evaluations, stating everything was a lie and that "they're [management] are lying on me [the CP]."

Ms. Venable relayed an episode she had with the CP when the CP purposely blocked her passage with a pallet on a pallet jack, backed Ms. Venable up to where she couldn't move and when she finally did get out of Ms. Venable's path she inadvertently bumped the pallet into Ms. Venable's cart causing the cart to hit her in the stomach. She acknowledges she asked the CP "what the f___ is your problem?" to which the CP never replied. Ms. Venable stated although she told management she said the "F" word she did not get in trouble with management for it. Ms. Venable acknowledged occasionally using profanity while she speaks and stated she even has used the "F" word while talking to Mr. Blythe but she dismissed it as just the way she talks.

During the interview Ms. Venable used the "F" word approximately five (5) times.

<u>William McCollum, Computer Assistance Operator, Newport Commissary, interviewed on 2 February 2006.</u>

According to William McCollum (White), he and the CP got along fine when he first arrived in March 2000, but one day (could not remember when exactly) the CP was speaking negatively about Mr. Blythe (could not remember exactly what was said), so he stood up for him and the CP has treated him badly ever since to include coughing on him so closely that he could feel her cough on the back of his neck, coughing on or near his food when he is eating and giving "evil looks like 'you'll get yours'."

Mr. McCollum stated he wrote statements to Mr. Blythe describing the incidents and because nothing ever seemed to be done he sent a fax to Richard Cook, Defense Commissary Agency (DeCA) Regional Director (could not remember exactly when it happened, but did remember the behavior didn't change).

Mr. McCollum stated when the CP became a Computer Assistance Operator in 2004, he was required to train her and at that time she acted nice toward him. However, shortly after he trained her the negative behaviors started up again. He said he asked the CP to leave him alone but she wouldn't. According to Mr. McCollum, it seems peaceful at the Commissary now that the CP is no longer working there.

Mr. McCollum said he's known of two Commissary employees who have stocked for vendors: Ms. Venable and Brian Berbue. He claimed he never witnessed either one stock during duty hours but did witness Ms. Venable stock before her actual work day started and Mr. Berbue stock after his work day ended. Mr. McCollum stated he's never stocked for vendors.

<u>Stephanie Lopez, Supply Technician, Newport Commissary, Interviewed on 2 February 2006.</u>

Ms. Lopez (Black), could not provide any information regarding the CP's termination other than to say she believes the CP was terminated because she spoke out against people who the CP perceived walked over her, to include John Blythe, Steven Furtado and Mary Gibson (Ms. Lopez could not provide any specific examples of anyone walking over the CP).

According to Ms. Lopez, she perceives Mr. Blythe favors White employees over everyone else stating Mr. Blythe allows Diane Walsh (White), to "get away with everything" to include spreading rumors that a former employee, Candice Ortiz (White) showed favoritism towards Ms. Lopez and once during a confrontation Ms. Walsh referred to Ms. Ortiz as a "honky" and another co-worker, Thelma Edens (Pacific Islander), as a "flip" and Mr. Blythe didn't do anything about it (Ms. Lopez could not recall exactly when this occurred). In addition, Ms Lopez stated she has heard Brenda Venable swear at Mr. Blythe repeatedly and nothing happened.

Regarding the allegation that some employees are allowed to stock for vendors while they are on the clock at the Commissary, Ms. Lopez stated the only one she was aware of was Brenda Venable, but could not provide specific times when she actually witnessed Ms. Venable was stocking.

Iva Felton, Store Helper, Newport Commissary, interviewed on 2 February 2006.

According to Iva Felton (Black), she could recall only two people that had been terminated in the 16 years she was there: Richard Walsh (White) and the CP. She could not recall when Mr. Walsh was terminated or the circumstances surrounding the termination). Ms. Felton stated the CP had her own way of doing things and didn't "bow down to anyone." She claims the CP and Ms. Venable were friends at one time and that Ms. Venable even "cussed out John [Blythe] when he said 'good morning' one time and Brenda [Venable] responded with 'what's so f---ing good about it?'" Ms. Felton stated that she doesn't believe Mr. Blythe did anything about it because if he did, she would have known because Ms. Venable would have complained about it later. Ms. Felton said that once Ms. Venable "cleaned up her act with John, she [Ms. Venable] was now against [the CP]."

Ms. Felton added that she once heard Mary Gibson, Grocery Manager, claim she was going to ensure the CP was fired before she [Gibson] leaves (although she could not recall when the statement was made) and that she knows Ms. Venable does stock for vendors (but doesn't know what time or when).

Mary Gibson, Grocery Manager, Newport Commissary, interviewed on 2 February 2006.

Mary Gibson (White), has been the Grocery Manager since August 2003, and according to Ms. Gibson when she first got

there, there were no problems with the CP. However, after the CP received a Letter of Reprimand in October 2003 for disobeying a direct order, "it was downhill ever since." Ms. Gibson stated the CP was written up previously for similar behaviors while she was Acting Administrator; she issued the CP a Letter of Reprimand on 25 February 2004 for "Failure to Follow Instructions" and "Disrespectful Conduct" on 5 December 2003. Ms. Gibson could not recall the specific reasons for issuing the Letters, nor could she produce copies.

Ms. Gibson claims that as far as she could tell, the CP had no reprimands on file prior to her arrival because no one ever held the CP to task. There were rumors of issues but no paperwork in the CP's personnel file. Ms. Gibson avers that since October 2003, the CP continued to show blatant disrespect for herself, Steven Furtado and John Blythe. Furthermore, it appeared that the CP could not get along with any co-worker either as there were always complaints of the CP coughing or looking at co-workers in a manner that would suggest disgust and contempt. According to Ms. Gibson, others who had received reprimands (could not recall names or provide specific examples) would turn things around whereas the CP continued on her same destructive path. Ms. Gibson recalled one other employee, Richard Walsh (White) who was terminated in October 2005 for disobeying orders.

Regarding stocking for vendors, Ms. Gibson said that Brenda Venable did stock for vendors in the mornings prior to work, and occasionally if there was a backlog of items that needed to get on the shelf for the customers if she [Venable] had nothing else to do she would stock during the day as well.

<u>Steven Furtado, Store Administrator, Newport Commissary, interviewed on 2 February 2006.</u>

According to Steven Furtado (White), the CP had an attitude problem that regardless of what management tried, she still created problems in the Commissary. He claims that when she became a Computer Assistance Operator (CAO) she was trained by William McCollum, CAO, himself and was even sent to school to learn how to be a CAO but after two years she never grasped the job. According to Mr. Furtado, he trained Mr. McCollum on being a CAO and grasped the job immediately so no additional training was required. Mr. Furtado said that the CP's store shelves were continuously empty because merchandise was not ordered and if he or Mary Gibson would inquire as to why the shelves were empty the CP would take it personally and respond with "I'm only here

for eight hours a day and if I do one thing or I do ten things I still get paid the same." He said the CP is always confrontational, always talks about her "rights" and acts as if 36 of the 37 Commissary personnel are "backstabbers," "liars," and "cheats."

Regarding the termination, Mr. Furtado said it was justified for her repeated failure to follow instruction; to include failing to obey an instruction to write a witness statement for an official investigation in September 2005 and failing to obey an instruction to bring in medical documentation to support an absence from work for one week in September 2005.

Mr. Furtado also cited the CP's disruptive behavior from August 2005 when the CP allegedly blocked the passage of Brenda Venable in the Dairy Receiving area and then interfered with Ms. Venable's movement when the CP pushed her pallet in her path.

In addition, Mr. Furtado claims the termination was justified because of the CP's disrespectful conduct to include the CP talking to and acting toward Mary Gibson in a disrespectful manner by folding her arms and staring at her without responding to direct questions, and then loudly saying, "why don't you just follow me with a camera and take pictures" in June 2005 and when the CP spoke to him in a loud, disrespectful and contemptuous manner "what do I look like, a two year-old child?" and "go ahead, write me up, I would like it written up also" in October 2005.

The CP received the Notice of Proposed Removal from Mr. Furtado on 17 October 2005. The Notice also informed the CP she would have 21 calendar-days to reply in writing or personally to the charges levied against her. The CP's attorney sent a letter challenging two of the nine specific issues on 18 November 2005, 32-days later. In the reply the attorney stated because of her workload she had requested extensions to reply but was denied. According to Mr. Furtado, an extension was granted. When I asked for specific paperwork or length of the extension Mr. Furtado could not recall the amount of time given and had no paperwork to provide.

15. <u>TITLE VII ANALYSIS</u>

a. <u>Prima Facie case for discrimination based upon race.</u>

The CP is a member of a protected class based on race, Black. The CP claims she was treated differently than other employees because she was terminated on 1 December 2005, for

failing to follow instructions, disruptive behavior and disrespectful conduct. The CP alleges other Commissary employees have committed similar and, in her opinion, worse offenses with little or no disciplinary action taken.

To establish a prima facie case of race discrimination the CP would be required to show she was treated less favorably than other similarly situated employees, or raise any other inference of discriminatory animus against her. The CP was able to provide instances where others have used unprofessional or disrespectful conduct but were not disciplined.

b. Management's articulated nondiscriminatory rationale for action taken.

According to management, no one has had such a disruptive impact on the Commissary as much as the CP and regardless of race, if others had acted in the same manner "they would have been terminated as well." Management claims they could no longer tolerate an employee who would continue to disregard instructions, was disruptive on the floor and was disrespectful to supervisors and co-workers.

Management stated the CP was written up previously for similar behaviors, receiving a Letter of Reprimand on 25 February 2004, for "Failure to Follow Instructions" and a Letter of Reprimand on 5 December 2003 for "Disrespectful Conduct."

c. Complainant's response to pre-textual argument.

Through her attorney, on 18 November 2005, the CP addressed two of the following issues in her attempt to refute the charges cited in management's 17 October 2005 Notice to Proposed Removal:

(1) Failure to Follow Instructions: Spec 3 - On or about 25 September 2005, the CP failed to obey an instruction to bring in medical documentation to support an absence from work for one week.

According to the attorney, the CP did exactly what the 26 September 2005 letter from Steven Furtado required/ordered her to do. The letter states the CP was required to provide administratively acceptable medical documentation not later than 7 October 2005. The attorney alleges "the doctor faxed the paperwork on 3 October 2005, as indicated on the fax cover sheet Date: 10/03/05" (Specialist's note: the fax address line at the top of the fax cover sheet indicates the fax went out on 8 October

2005 at 10:40 pm). In addition, the attorney claims that when the CP gave Mr. Furtado the original doctor's note on 25 September 2005 placing her out for a week Mr. Furtado allegedly explained to the CP the note was insufficient; however, the CP could produce documentation after she returned to work which, the attorney claims the CP did. Mr. Furtado stated he informed the CP both verbally and in the 26 September 2005 letter she needed to provide the correct medical documentation and in the letter informed the CP that she would be held in AWOL status during the time she was out until she provided the documentation. The CP claims she never received the letter as she was away the week she was out.

(2) Failure to Follow Instructions: Spec 2 - On or about 2 September 2005, the CP failed to obey an instruction to write a witness statement for an official investigation.

According to the attorney, even though the CP is faulted for not filing a witness statement, when she was asked to do so the CP "made it clear" she had no information to provide because she had not seen anything. Mary Gibson and Steve Furtado both stated the CP was told to write a statement and if she didn't see anything she needed to indicate that in her statement.

In her formal complaint paperwork, The CP provided the following additional examples of how she feels she was treated differently, via the termination, than other store employees who she believes committed similar or worse offenses yet were not terminated:

(1) Mike Texeria was allowed to touch Stephanie Lopez on the butt and his only discipline was to watch a movie regarding sexual harassment. In addition, Mr. Texeria punched a co-worker to the floor during an altercation and he was only suspended for two days.

(2) William McCollum was allowed to come in to work late, sometimes by as much as one hour and 45 minutes and he was never counseled, however, the CP stated she received a Letter of Caution for being 10 minutes late. In addition, Mr. McCollum is allowed to gamble and collect money from employees while betting on sporting events. Also, on 31 March 2005, Mr. McCollum came to work and "told off" Mr. Blythe and Mr. Furtado with no repercussions.

(3) Diane Walsh is allowed to shop in the Commissary without proper identification and when she's been caught nothing happened. In addition, Ms. Walsh has been reported numerous

times for "being mean to customers and employees [and] she might get a little hit on the hand (if that)."

(4) Mary Gibson comes in to work under the "influence of something. Everyone knows and nothing happens." In addition, Ms. Gibson is allowed to yell at employees and swear at them and whenever the CP went to Mr. Furtado to report it nothing happened. Ms. Gibson ate a tomato in front of Charles Cloud, Store Employee, and when Mr. Cloud asked why something wasn't done about her stealing produce, Mr. Furtado said nothing. The CP also claims Ms. Gibson uses store employees to baby sit for her kids and even sets schedules according to how she needs a sitter.

(5) Brenda Venable was allowed to commit fraud by accepting checks from vendors for stocking merchandise while on her shift at the Commissary. In addition, Ms. Venable was caught twice taking merchandise from the Commissary to her car without paying for it. Stephanie Lopez allegedly wrote a statement for the Naval Station Newport Police but it appeared to the CP nothing else was ever done. The CP also claimed that she has informed Mr. Furtado on several occasions that Ms. Venable would yell and swear at her but Mr. Furtado would turn it around to make the CP "the bad person." According to the CP, on 5 June 2005, Ms. Venable yelled at Mr. Furtado for letting cashiers vendor stock baby food and Mr. Furtado did nothing.

16. <u>INFORMATION DEVELOPED RELATING TO THE ISSUES</u>

The analysis of whether disparate treatment occurred must include an examination of how similarly situated persons were treated by the same decision-makers.

Two interviewees stated "others" have behaved with similar confrontations with Mr. Blythe but the only name that came up during the fact-finding was that of Brenda Venable. The interviewees stated they heard Ms. Venable swear at Mr. Blythe, which he acknowledges did occur, but said he verbally counseled Ms. Venable and the behavior stopped and was not repeated. However, the two interviewees stated they had heard her swear more than once at Mr. Blythe.

When management was asked to provide information, a list of names of personnel and/or offenses that required counseling, suspension or termination, Mr. Blythe stated he was not allowed to release that information and that it had to be obtained from DeCA HQ. When the same information was sought from DeCA HQ,

they also failed to provide any paperwork showing where any employee other than the CP was written up, counseled, or had any other action taken for any of the behaviors alleged by the CP to have taken place by other employees. In addition, they failed to provide the Letters of Reprimand the CP received on 25 February 2004, for "Failure to Follow Instructions" and on 5 December 2003 for "Disrespectful Conduct." This created an obstacle as no accurate comparison or analysis of how similarly situated personnel were treated with regards to comparable seriousness of behaviors and no paperwork was provided to establish a trend of negative behaviors allegedly displayed by the CP. Furthermore, the lack of paperwork created an inability to either support or refute the allegations peppered throughout the report by various interviewees to include management.

Management offered reasons for their actions, however, because they could not provide requested paperwork on similarly situated personnel, the reasons offered can not necessarily substantiate the reasons were non-discriminatory.

Additional obstacles included an overwhelming majority of interviewee's inabilities to recall specific names or dates and for the most part could only provide "examples" of alleged disruptive or disrespectful behaviors by employees other than the CP.

17. RESOLUTION ATTEMPTS

Management was not amenable to a resolution of the CP's issues at this time.

Thomas LaBelle
EEO Specialist